UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

RENEE MESSIER,                          )
                                        )
        Plaintiff,                      )
                                        )          No. 3:10-cv-977 (CSH)
v.                                      )
                                        )
THE UNITED STATES OF AMERICA            )          JULY 12, 2013
and INTERSTATE NAVIGATION               )
COMPANY,                                )
                                        )
        Defendants.                     )

## OPINION, FINDINGS OF FACT AND CONCLUSIONS OF LAW

**HAIGHT, Senior District Judge:**

## I.  INTRODUCTION

This action within the Court's admiralty jurisdiction arises out of a collision on July 2, 2008 in Block Island/Rhode Island Sound between the United States Coast Guard Cutter MORRO BAY and the ferry boat BLOCK ISLAND, owned and operated by Interstate Navigation Company.  When the collision occurred, the BLOCK ISLAND was engaged on a voyage from Point Judith, Rhode Island, to Block Island.  Plaintiff Renee Messier was a passenger on board the BLOCK ISLAND. She claims that the impact of collision caused her to suffer injuries.

To recover damages for those injuries, Plaintiff filed a complaint in this District against Defendant United States ("the Government"), the owner and operator of the MORRO BAY, and against Defendant Interstate Navigation Company ("Interstate"), the owner and operator of the

BLOCK ISLAND.  Subject matter jurisdiction is founded upon the general maritime law, 28 U.S.C. § 1333; the Suits in Admiralty Act, 46 U.S.C. §§ 30902-30918; and the Public Vessels Act, 46 U.S.C. §§ 31101-31113.

On February 4, 2013, following discovery, the case was called for trial before this Court, sitting without a jury.  At the beginning of the trial, counsel for the parties presented and the Court endorsed a Joint Stipulation as to Liability [Doc. 36 & 38].  All three parties stipulated that the two Defendants, the Government and Interstate, "are each fifty percent liable for the vessel collision" in suit.  Doc. 38 at ¶ 1.  The stipulation further provided that the Defendants "reserve the right to contest the medical causation and the nature and extent of the Plaintiff's claimed injuries at trial." *Id*. at 2.  In these circumstances, the trial focused principally upon the issues of whether the collision between the vessels caused Plaintiff any injury, and if so, the nature and extent of that injury.  The trial began on February 4, 2013, and concluded with the oral summations of counsel on February 6.  Plaintiff's theory of the case is that the collision between the MORRO BAY and the BLOCK ISLAND caused her severe and permanent injury.   The Government's  and Interstate's theory of the case is that the collision between the vessels did not cause Plaintiff any injury – or, perhaps to put the point more precisely, Plaintiff did not prove a causal connection between the collision and any injury or adverse physical condition.  If Plaintiff succeeds on that core issue, any amount of damages awarded will be divided equally between the two Defendants, in accordance with the stipulation as to liability.

The Court, having considered all the evidence and the able summations of counsel, enters the following Findings of Fact and Conclusions of Law, in accordance with Rule 52(a) of the Federal Rules of Civil Procedure.

2

## II.  FINDINGS OF FACT

1.   Plaintiff Renee Messier was born on June 3, 1963.  At the time of the trial (February 2013) she was 49 years of age; she has since attained her 50th birthday.  Renee Messier has been married to Gregory Messier for 29 years.  They have one child, a daughter Jessica, now a college student.  The Messiers live in Danville, Connecticut.

2.   On July 2, 2008, Renee and Gregory Messier traveled by car from Danville to Point Judith, Rhode Island.  They planned to board the ferry boat BLOCK ISLAND for a passage from Point Judith to Block Island, in order to spend the Fourth of July weekend as guests on the boat of friends, George and Cheryl Carpenter.  The ferry BLOCK ISLAND was owned and operated by Defendant Interstate Navigation Company.

3.   The Messiers boarded the BLOCK ISLAND during the morning of July 2, 2008.  The ferry departed Point Judith for Block Island at approximately 11:55 a.m.  Visibility was reduced by fog.

4.   The ferry has two passenger decks: the main deck and an upper deck, above the main deck.  These two decks are connected by stairs enclosed in stairwells.  Below the main deck there is a cargo space where vehicles are stowed.  The Messiers did not take their car on board the ferry.

5.   When the ferry began to move, the Messiers were sitting on a bench in the covered and enclosed main deck area.  The ferry passed through the Point Judith breakwater and into the open water of Block Island Sound.  Renee Messier is prone to seasickness, and accordingly she left the passenger sitting area, walked aft on the starboard side of the ferry, through a doorway, and into a passageway which ran fore and aft along the starboard side, with open window spaces along the side,

3

admitting the fresh air she sought to ward off seasickness.  Gregory Messier accompanied his wife, and they both stood in this new area.

6.   Shortly after the Messiers moved to this starboard side passageway on the BLOCK ISLAND, the ferry collided with the Coast Guard Cutter MORRO BAY.  The MORRO BAY was owned and operated by Defendant United States of America.  The Defendants have stipulated that the collision was caused by the fault of those navigating both vessels, with the proportion of fault divided equally between them.  In consequence, these Findings of Fact do not describe in any detail the maneuvering and navigation of the colliding vessels.  Instead, these Findings focus initially upon what happened to Renee Messier, on board the ferry.

7.   Two disputed issues of fact are central to the case.  First, at the time of the collision between the ferry BLOCK ISLAND and the Coast Guard Cutter MORRO BAY, was Plaintiff Renee Messier holding on to a railing on the ferry with her right hand?  Second, did the impact of collision cause any injury to Messier's right shoulder?   These two questions, while separate, are also interdependent, much as the inner structure of a human body's shoulder is made up of separate but interdependent parts.

8.   The parties' contentions in respect of these two questions are diametrically opposite.  Plaintiff's theory of the case is that when the impact of collision occurred, she was holding onto a railing on the ferry with her right hand, and in consequence suffered a traction injury of her right shoulder.  Defendants' theory of the case is that the Court should not credit Plaintiff's claim of holding onto a ferry railing, and any pain or discomfort she has felt after the collision is the result of pre-existing physical conditions, for which Defendants bear no liability.

9.   As for Messier's asserted holding on to a ferry railing, the parties' disagreement is clearly

4

expressed in their Proposed Findings of Fact at the beginning of the trial, and in counsel's summations at its conclusion.  Plaintiff's Proposed Findings of Fact [Doc. 35] state in ¶ 2: "At the time of the collision, Renee Messier was holding on to a rail with her right hand."  Defendants' Proposed Findings of Fact [Doc. 34] state in ¶ 4: "While Mrs. Messier alleges that she was holding onto a rail under the window with her right arm, in fact there is no handrail there."  In his summation after all parties rested, counsel for the Government said: "While Mrs. Messier's recollection is that she was holding on to a rail at the time of the collision, there is no handrail where she was standing." Tr. Vol. 3 at 23.[1]  Counsel for Plaintiff said in summation: "All of the credible evidence, your Honor, is that she was holding on to a rail or holding on to something with her right arm and that the force of the impact between these tremendously heavy vessels caused her to stretch her arm and to twist around . . . " Tr. Vol. 3 at 48.  I will consider in detail the trial evidence on this question of fact.

10.  Plaintiff Renee Messier testified at trial concerning the relevant events.  Prior to that time, she had given accounts of the incident to two treating physicians: Heather Sullivan, M.D., a family physician, board certified in family medicine, who is Plaintiff's primary care physician; and Ammar Anbari, M.D., a board certified orthopedic surgeon, who operated on Plaintiff's right shoulder.  These physicians testified at the trial: Dr. Sullivan in person, Dr. Anbari through the medium of a previously videotaped deposition, which was shown in the courtroom during the trial.

---

[1] The case was tried to the Court on February 4, 5 and 6, 2013. The evidence was completed during the first two days, and counsel summed up on the third.  The transcript consists of three numbered volumes, one for each day, with the February 4 and February 5 volumes (Volumes 1 and 2) being divided into separate morning and afternoon sessions, and the page numbering beginning again at "1" at the start of each session.  I include this footnote to explain the citations to the transcript that appear in this Opinion.  Thus a citation of "Tr. Vol.1 a.m. 31" means that the testimony quoted is from page 31 of the transcript for the morning session in Volume 1, covering the first day of the trial.

Relying on contemporaneous notes in their medical files and  upon memory, Dr. Sullivan and Dr. Anbari described what Plaintiff recounted to them with respect to the impact between the vessels and its effect upon Plaintiff.

11.  The collision occurred on July 2, 2008.  On October 17, 2008, Plaintiff was examined at Dr. Sullivan's office.  Dr. Sullivan testified that during the period between July2 and October 17, Plaintiff "had been seeing a physical therapist and a chiropractor who did just gentle manipulation, trying to improve her shoulder pain."  Tr. Vol. 1 p.m. at 31.  Dr. Sullivan then testified with respect to Plaintiff:

> She right away came in and described for me what had happened when the Block Island and the Coast Guard collided.  That she had been holding on to the rail with her right hand, to keep balance.  And when they collided, she was thrown.  She did not hit the ground, but only because she held on so strongly with her right hand.  And as a result, she developed pretty severe right shoulder pain.

*Id*.  Dr. Sullivan's diagnosis at that time was that "the description and her symptoms were consistent with a traction injury to the right shoulder."  *Id*. at 33.

12.  On March 24, 2011, Plaintiff on her own initiative, without being referred by another physician, obtained a consultation with Dr. Anbari to consider the possibility of surgery to relieve continuing right shoulder pain.  With respect to that initial consultation, Dr. Anbari testified:

> Renee presented to see me specifically for her right shoulder pain.  In her intake history, which [*sic*] I saw her the first time, she stated that she was on a ferry boat going to Block Island.  There was a collision between that boat and another boat.  Renee was standing in the back of the boat, from my understanding.  She was holding onto the railing.
>
> She'd had a very extensive history of things going on in her lower extremities, so her leg is weak.  She lost her footing and she ended up grabbing the railing really hard from the impact of the injury [*sic*] and

6

she sustained a traction injury to her right shoulder.

Deposition Tr. 11-12.  I take the medical use of the noun "history" to indicate that this is the account

of events Renee Messier gave verbally to Dr. Anbari at their first meeting.  I am confirmed in that

impression by this exchange during the defense cross-examination of Dr. Anbari: "Q.  Now, you

related these diagnoses to the July 2, 2008 ferry collision based on a history that was given to you

by Renee Messier; is that correct?  A. Correct."  Deposition Tr. 42.  Amplifying on that point, Dr.

Anbari testified later in his cross-examination:

> A more minor impact can cause her to lose her balance more easily.
> And I think at least from her description on multiple occasions, is that
> she was holding onto the railing so she does not fall down.  So as a
> result, the body weight was being pulled away – My interpretation of
> it was, her body was being pulled away from the railing and she held
> on with her right side to the railing to prevent herself from falling.

Deposition Tr. 43-44.  Dr. Anbari's "interpretation" of the events was based upon what Messier told

him.

13.  Thus, the evidence shows that Plaintiff told both treating physicians that when the impact

of the collision manifested itself on the ferry boat, she was holding onto a railing with her right hand.

I may consider Plaintiff's statements, testified to by Drs. Sullivan and Anbari, as evidence of the truth

of the matters asserted in Plaintiff's statements.  Those statements fall within the exception to the

hearsay rule found in Fed. R. Evid. 803(4), which excepts a statement that "(A) is made for – and

is reasonably pertinent to – medical diagnosis or treatment; and (B) describes medical history; past

or present symptoms or sensations; their *inception*; or their *general cause*." (emphases added).  The

Advisory Committee Notes to Rule 803(4) recite the general principle that statements of present

condition are admitted "if made to a physician for purposes of diagnosis and treatment in view of the

patient's strong motivation to be truthful," and continue:

> The same guarantee of truthfulness extends to statements of past conditions and medical history, made for the purposes of diagnosis or treatment.  It also extends to statements as to causation, reasonably pertinent to the same purposes, in accord with the current trend. Statements as to fault would not ordinarily qualify under this latter language.  Thus a patient's statement that he was struck by an automobile would qualify but not his statement that the car was driven through a red light.

(citations omitted).  In the case at bar, Plaintiff's statements to her physicians that she was holding on to a railing when the collision impact was felt is directly pertinent to the doctors' medical diagnoses, since the statements enable the doctors to understand the mechanics of the injury and the forces to which Plaintiff's body was subjected.  Plaintiff's "strong motivation to be truthful" is found in the obvious proposition that a patient wants her physician to know everything that might assist him in arriving at an accurate diagnosis and then fashioning effective treatment.

14.  I turn now to the testimony of the only two lay witnesses with direct knowledge of the facts relevant to the question of whether the collision impact had any effect upon Renee Messier. Those witnesses are Plaintiff Renee Messier herself, and her husband, Gregory Messier.  At the moment of collision, the  Messiers were standing together in an aft covered area of the ferry, on the starboard side.

15. Renee Messier testified on direct examination that she gets seasick easily, and continued:

> So, when the boat started to leave and we left about 10 minutes late, not too long after we got out the breakwall, I got up and went out back further to the open window.  It helps for me to be in the open air.
>
> We walked through a doorway where all the benches were like inside.  When you go out the doorway and there was a stairwell where you could go upstairs to the open part of the ferry.  And there were a couple like cut-out open windows with no glass or anything.  And I

was just standing there and Greg was leaning up against the stairwell.

Q.  Were there railings there where you were standing?

A. (after Court overruled objection to the question): Yes.

Q. And describe the railings for the Court as best you can, Renee.

A. They were like tacked against the underneath of windows were they were [*sic*] in various places throughout the boat.

Q.  Can you describe how long they were, what they looked like, anything like that?

A. I don't remember exactly how long they were.  At some spots, they went for a few feet.  I don't exactly remember.

Q. And do you recall approximately where you were on the ferry boat in terms of front to back or side?

A. It was more – it wasn't in the middle.  It was – I wasn't at the way back, but I was more towards the back of the boat.

Q.  All right.  And assuming the front of the boat was going forward, were you on the right or the left of the boat?

A.  On the right.

Q.  On the right.  So, tell us what happened.

A.  It was very foggy.  Like I said we were  – I got up from inside, we both went out to stand in the open air.  And the – and we noticed it was very foggy.  And you could – from all our years going back and forth to the island, we kind of understood a little bit of boating from our friend, Woody.

So, the fog horn was going on and off periodically and it was a steady routine they were doing.  And then all of a sudden, they got on the fog horn and didn't stop.  So, I had turned to look to my husband.  And then when I did, out of the left of my eyes, I could see it was like a beige color.  And I couldn't make out what it was or if it was a person or anything.  I just remember seeing that.  And then I had just said to my husband, Somebody must be in the way.  And that's when

9

we got hit.

Q.  At the time that you got hit, were you holding onto anything?

A.  Yes.

Q.  What were you holding onto?

A.  I believe it was a railing.

Q.  And with what were you holding on, with your arms?

A.  My right arm.

Q.  Your right arm.  And can you describe for the Judge as best you can, Ms. Messier, what the impact felt like to you?

A.  It was like a big thud.  I mean, it threw my balance way off.  And my balance isn't perfect to begin with.  So, I went – I grabbed – whatever I was holding onto, I grasped it.  And then it jerked all my body weight to the left and then back.

Q.  Did your right hand ever let go of the rail?

A.  No.

Q.  Did you fall to the ground?

A.  I did not.

Q.  Why not?

A.  Because I was holding onto that railing very tightly.  And that's my biggest fear, to fall.  So, I did everything I could to not fall.

Q.  Did you have any idea that there was going to be an impact?

A.  No.

Q.  I forget, I'm sorry, did you say you lost your balance?

A.  I did.

10

Q.  Describe that for us.

Q.  When the collision occurred, my body weight went flying to the left as I held onto the railing.  And I came a couple of inches close to the floor, but I did not fall.

Tr. Vol. 1 a.m. 56-60.  Counsel for the Defendants did not cross-examine Renee Messier with respect to this account.  Their examination was confined to her very considerable medical history, before and after the incident in suit.

16.  Gregory Messier testified on direct examination:

A.  We left Point Judith, headed out, fifteen, twenty minutes later. Well, the day was pretty foggy and very tough to see.  Fifteen minutes or so past the brake wall [*sic*], the sound of the horn of the ferry boat was on for quite a bit of time.  And before that it had come on periodically, I believe, because of the fog and the weather.

We were slowed down abruptly and hit the Coast Guard boat.  And it kind of launched us forward a little bit.  And from that point on, it was maybe forty-five minutes before they even came on the intercom to even tell us what was going on with the collision.

Q.  Do you recollect where you and Renee were situated just before the collision?

A.  Yes, near the mid-ship area, facing the front of the boat.  We were on the right side of the boat.  There was an opening.  It was like a window opening in the boat.

Q.  And were you standing?

A.  I was standing, yes.

Q.  Were you attached to anything?

A.  I was somewhere near the stairwell to the rear of Renee.

Q.  Was Renee standing or sitting?

A.  She was standing.

11

Q.  And did she have hold of anything?

A. She was near the window opening.  I believe she was holding on to a rail or something near the window opening.

Q.  Did you have any idea that there was going to be a collision?

A.  I didn't know what was happening, but as far as the long sound of the horn was different than what it was previously.  You had short blasts of the horn.  And the boat slowed down quite a bit.  We were all wondering what happened and the collision happened soon after.

            *     *     *     *     *     *     *     *

Q.  Would you describe the impact for us, please, Mr. Messier?

A.  Yes.  Like I was saying, it was slowing down quickly and then came to an abrupt halt.  I wasn't ready for it, but I mean it definitely launched it forward and it was nothing we felt on one of the ferry boats before.

Q.  Was it to you a big impact, a medium impact or a small impact?

A.  I would say it was a medium to large impact.

Q.  Were you – did you have any trouble keeping your balance?

A.  I didn't fall down or anything, but like I said, I believe I was leaning against somewhere near the stairwell.  But yes, it definitely caught me off guard and launched me forward.

Q.  Did you have your eyes on your wife when the impact occurred?

A.  I was looking towards the window and yes she was in my line of view.

Q.  Did you see what happened to her?

A.  Yes, like I said, it came to an abrupt halt.  It launched her forward.  And where she was holding on, she kind of turned to the left and twisted while she was holding on to where she was holding.

Q.  Did she fall to the ground?

A.  No, she didn't.

Tr. Vol. 1 p.m. 71-74.  On  cross-examination, counsel for the Government elicited from Gregory Messier testimony that at the time of collision he was leaning against the stairwell, did not see anyone fall, and did not see anybody get injured.  *Id*. at 82.

17.   Defendants argue that the Court should not credit the Messiers' testimony that at the moment of collision impact, Renee Messier was holding on to a rail with her right hand.  If Defendants are correct, the Messiers' testimony that Renee Messier *was* holding on to a rail is the result of either mistaken recollection or deliberate perjury.  Defendants do not go quite so far as to claim the latter.  My impression of Renee and Gregory Messier is that they were credible witnesses, in the sense of testifying on the basis of honest recollection rather than making up falsehoods. Having considered all the evidence on the point, I find that at the moment of collision between the ferry boat and the Coast Guard vessel, Renee Messier was in fact holding on to a ferry boat railing with her right hand.  I make that finding for several reasons.

18.   The Defendants' contention that Renee Messier was *not* holding on to a railing depends principally upon a color photograph of the area in question on board the ferry that was admitted at trial as Def. Exhibit 523.  That photograph shows a section of an interior passenger walkway on the BLOCK ISLAND which her captain, Steve Alan Kimball, testified was "the starboard catwalk." Tr. Vol. 2 a.m. 69.  It is undisputed that this is the location on the ferry to which the Messiers proceeded in search of fresh air, as Renee Messier described in her testimony quoted in ¶ 15  of these Findings. The picture is taken facing forward on the ferry.  A line of window-like apertures appears along the right-hand side of the picture.  The seasick-prone Renee Messier sought these openings as a source of fresh air.  The left side of the picture shows an interior wall (a mariner would probably say

13

"bulkhead") running fore and aft and up to the ceiling, and terminating close to the bottom of the stairwell leading from the ferry's main deck to the upper deck. A handrail runs along the side of that wall, and bends to the left and disappears from the picture when the wall reaches the stairwell.

19. Def. Exhibit 523 is one of several photographs of the same area on the ferry, clearly taken at the same time. The other photographs in the series were pre-marked Def. Exhibits 524, 525 and 526. The Pre-Trial Order recited that all these photographs were admissible without objection. During the trial, only Exhibit 523 was shown to a witness, testified about, and separately received into evidence by the Court, but the entire series is useful in making these Findings of Fact, and in the circumstances I commit no impropriety in considering Exhibits 524, 525 and 526 as part of the trial record.

20. What these additional pictures show is the manner in which the railing running along the interior (or inboard) wall (or bulkhead) turns 90° to the left, as the wall itself turns away from paralleling the starboard side of the ferry and proceeds toward the vessel's center line. Exhibit 526 is particularly vivid in that regard. In addition, Exhibits 524 and 525, taken as the photographer approached and then arrived at the bottom of the stairwell from the upper deck, are useful because they reveal how narrow and confined these spaces on the ferry really are. Looking at Exhibit 523, Captain Kimball's attention was called to a structure running fore and aft just below the windows depicted on the starboard side. "That's a flat bar," Captain Kimball testified. "It's used to – it's a stiffener for the hull, so the hull doesn't warp. It's approximately an eighth of an inch thick, probably three inches wide and maybe about 10 feet long." Tr. Vol. 2 a.m. 72. He further testified that one could not grasp the stiffener and hold onto it.

21. I accept Captain Kimball's testimony that no one could hold onto the flat bar under the

windows for support.  I also accept his testimony that the bar is only three inches wide.  That latter dimension, when viewed in its setting on the starboard side of the catwalk, furnishes rather dramatic evidence of how narrow a passage the catwalk is.  For example, Exhibit 526 is a view looking aft along the catwalk from the bottom of the stairwell.  The three-inch-wide flat bar consumes a discernible portion of the catwalk's total width.  More of that width is consumed by a series of vertical beams or structures which appear to be twice the width of the flat bar, or about six inches wide.  Captain Kimball aptly referred to this passageway as a "catwalk."  Three cats could walk abreast along the passageway if they were house cats, but they would not fit if they were tigers.  Three human beings, even the non-obese, would be hard pressed to stand abreast in this confined space.

22.  These spatial reflections are relevant to the issues because Government counsel argued in summation that "[w]hile Mrs. Messier's recollection is that she was holding on to a rail at the time of the collision, there is no handrail where she was standing."  The evidence allows that argument if the phrase "where she was standing" is interpreted to mean a position in immediate proximity to the starboard side windows.  However, the pictures in evidence show a handrail running along the inboard bulkhead forming the other side of the confined space where Renee Messier was standing, having left the covered upper deck to obtain fresh air from the open windows.  Presumably Government counsel had in mind Renee Messier's testimony that the railings in question "were like tacked against the underneath of windows," which does not accord with the photographic evidence.  Gregory Messier testified that Renee Messier "was near the window opening.  I believe she was holding on to a rail or something near the window opening."  That testimony is not necessarily inconsistent with the photographic evidence; given the narrow confines of the space where Renee

Messier was standing, it can fairly be said that she was holding on to a rail "near the window opening."

23.   I find that just before and at the moment of the collision, Renee Messier, whose balance was compromised by her pre-existing condition, and concerned by the sudden and persistent sounding of the BLOCK ISLAND's fog horn, reached out with her right hand and held on to the railing depicted in the photographs in evidence, while facing toward the open windows across the narrow catwalk.  I base the finding of the direction Renee Messier was facing upon her testimony, which I credit, that she caught a glimpse of the other vessel "out of the left of my eyes," which is the line of vision that would result if she was facing out to starboard and the collision occurred at the ferry's bow.  Renee Messier's recollection that the handrail "was tacked against the underneath of windows" is inaccurate, but I think represents an error of recollection understandable in the circumstances, and does not preclude the finding recited in this paragraph, which I make on the basis of all the trial evidence.

24.   The trial evidence probative of this issue includes the testimony of Dr. Heather Sullivan, quoted in ¶ 11.  Dr. Sullivan had been Renee Messier's primary care physician for a number of years. The first time Messier saw Dr. Sullivan after the collision was October 17, 2008, three and a half months after the incident.  Dr. Sullivan testified that at the beginning of that office visit, Messier told Dr. Sullivan that when the vessels collided, "she had been holding on to the rail with her right hand, to keep balance.  And when they collided, she was thrown.  She did not hit the ground, but only because she held on so strongly with her right hand."  I accept Dr. Sullivan's  description of what Messier told her during that consultation.  Dr. Sullivan was an articulate, impressive, non-partisan professional witness.  Every trial judge becomes familiar with the board-certified, highly qualified,

bespoke-clad physician who testifies forcefully as a medical expert at the behest of one party, only to have it made plain on cross-examination that the physician makes most of his or her living as an expert witness at trials, rather than practicing medicine in office, hospital or operating room.  Dr. Sullivan is not one of those; neither, I should add, is Dr. Anbari or Dr. Alleyn, the other physicians who testified at this trial.  So I accept that on October 17, 2008, Renee Messier related to Dr. Sullivan the account whose substance Dr. Sullivan described in her testimony.

25.   Moreover, I may and do consider Messier's account to her physician as non-hearsay evidence of the truth of the facts asserted in that account, for the reasons stated in ¶ 13.  The consultation was close enough in time to the collision to leave Messier's recollection unimpaired; Messier's only discernible motive was to give an accurate description of events to her physician, in hopes of an accurate diagnosis and effective treatment; and there is no reason to suppose that Messier deliberately gave a false account to Dr. Sullivan in order to enhance or support a possible future lawsuit against the vessel owners for personal injuries.  These factors enhance the trustworthiness of the account Renee Messier gave to Dr. Sullivan about how her injury came about: specifically, that she has holding on to a ferry handrail when the collision occurred.

26.   The conditions for which Messier was subsequently treated may also be probative of whether the collision caused her any injury, and if it did, the nature and extent of that injury.  On these issues the parties are sharply divided, and it is necessary to consider the medical evidence in detail.

27.   Renee Messier has contended with serious medical and physical conditions.  She described her medical history in her trial testimony, and the subject is also treated in detail in the Stipulated Uncontroverted Facts appearing in ¶¶ 27-41 of the Joint Trial Memorandum [Doc. 33].

Those Stipulated Facts are one of the sources of the Findings that follow.

28.  When she was seven years old,  Renee Messier was diagnosed with Ewing's Sarcoma, a bone cancer centered in the left pelvis.  She underwent surgery to remove the tumor and part of the bone, followed by radiation.  The cancer metastasized to Messier's spine, and in late 1971 or early 1972, while she was either seven or eight years old, Messier underwent spinal surgery to remove the affected areas of bone, followed by further radiation.

29.  This spinal surgery left Messier a paraplegic, and her physicians indicated to her parents that she might never walk again.  Messier engaged in intense physical therapy, with the assistance and support of her parents (her father got down on the floor with her for push-ups and sit-ups).  She also went to the hospital for out-patient hydro tub treatments, and did swimming, "any kind of movement I could."  Responding to this dedicated protocol, Messier's paraplegia receded, and after a year or year and a half she could walk again, albeit with assistance, holding on to someone's hand "for a little while."

30.  In 1978, Messier had to undergo a surgical spinal fusion.  The prior cancer surgery had removed so much bone and tissue that Messier developed scoliosis, or curvature of the spine, which caused back pain and affected the use of her legs.  During this procedure, the surgeons rebuilt some vertebrae in the spine.  Following this surgery, Messier resumed intensive physical therapy.  She was by then "a freshman in high school."[2]  The third surgery helped Messier; she "felt much straighter and stronger" and her balance was better.  But she would tire easily and it "took more work for me to get around," so in 1980, during her junior year in high school, Messier underwent a fourth surgical procedure: a surgical muscle transfer in her left hip, in medical parlance "a modified Sharrod

---

[2]  Her word, Tr. Vol. 1 a.m. 29; I will refrain from saying "freshperson."

iliopsoas transfer surgery." Tr. Vol. 1 a.m. 29-30; Joint Trial Memorandum, p. 18, ¶ 27. She reached

a plateau in her overall recovery and condition about a year after that fourth surgery, "almost to the

end of my senior year." She testified at trial:

> Q. And at that time, Ms. Messier, can you tell the Judge how you
> were doing with your walking and balance and all that sort of thing?
>
> A. I was doing pretty well. I did as well as I could be from what I'd
> dealt with my whole life. I mean, I tried to do as many normal things
> and physically, to my ability, what I could do. I went out with my
> friends and went to dances, and parties and social events.

Tr. Vol. 1 a.m. 31.

31. Based upon Renee Messier's trial testimony, demeanor and the medical evidence, I find

that she is a determined and courageous woman who throughout her life has refused to surrender to

significant physical impairments or to self-pity, but instead strives through the efforts of physicians

and physical therapists (and with family support) to live as full a life as the hand she was dealt will

allow. That finding is relevant to additional findings I will make in the case.

32. Ever since her first surgery as a child for Ewing's Sarcoma, Messier has walked with a

limp, caused by pain and instability in her left leg. She walks with a limp today; it was noticeable

in the courtroom, and one must conclude the condition is permanent. Over the years, Messier has

experienced a series of additional medical and physical conditions and problems, and undergone a

variety of treatments. They are summarized in the immediately following paragraphs of these

Findings: a summary derived principally from ¶¶ 28-41 of the Stipulated Uncontroverted Facts, at

pp. 18-21 of the Joint Trial Memorandum, as amplified or clarified by Messier's trial testimony.

33. After graduating from high school, Renee Messier attended community college and then

found employment as a bookkeeper and accountant. She met her husband, Gregory Messier, at work

and they have been married 29 years.  She was employed from 1984 through 1999, at which time the

Social Security Administration ("SSA") determined that she was disabled and entitled to benefits

retroactively beginning on February 11, 1999.  In connection with the SSA proceeding, Messier

presented medical evidence establishing that she had chronic scoliosis and a gait disorder rendering

her unable to perform sedentary work.  The SSA relied upon a physician's opinion that, because

Messier's upper and lower extremity functions were affected by her impairment, her abilities to

climb, balance, stoop, kneel, crawl, reach, push, pull and bend were either precluded or limited.

34.  In 1987, Messier injured her neck, shoulder and back in a motor vehicle accident,

suffering whiplash injury when the car in which she was riding was rear-ended by a car going over

50 mph.  Messier was diagnosed with chronic right para-thoracic pain and chronic right sub-scapular

pain following the accident.  She complained of and received treatment for those injuries for years

following the accident.

35.  Shortly before and after the birth of her daughter in 1989, Messier was treated surgically

for the removal of a small wire, installed during the original operation for Ewing's Sarcoma, which

had disintegrated and begun to penetrate the skin: a procedure that seems to have totally alleviated

that  problem.

36.  Renee Messier was followed continuously throughout the 1980s and 1990s for back pain,

right scapula pain, and neck pain.  She was diagnosed with degenerative spinal disk disease in the

1980s.  Between 2001 and 2004, Messier complained of, and received treatment for, shoulder pain

and right upper extremity numbness.  Also between 2001 and 2004, she complained of neck pain,

and received treatment for her cervical spine.  Messier experienced a fall in November of 2004, and

immediately complained of pain in the right neck, shoulder, back, and radiating symptoms in her

upper right extremity. Since the 2004 fall, but prior to the 2008 ferry incident, Messier complained

of, and received treatment for, right shoulder pain, numbness, tingling, and pain in her right upper

extremity, and neck pain, and received cervical spine treatment.[3]

37. In March 2005, Messier had an MRI of her cervical spine for neck and right arm pain

that showed very mild cervical degenerative disc disease and degenerative disc disease in the upper

thoracic spine. In June 2007, Messier complained to Dr. Frederick Barkes, a chiropractor, that her

chronic back pain had worsened and that she was concerned about persistency of her pain and its

effect on her future. She had recently undergone an MRI and CT scan of her lumbar spine on

account of pain in her low back and left leg; they showed moderate to severe spinal stenosis and

degenerative joint disease in her lumbar spine. In August 2007, Messier reported to Dr. Sullivan that

she was experiencing severe episodes of pain and wanted stronger medication. On July 11, 2007,

Messier saw Dr. Thomas Arkins, a neurological surgeon, due to increased back pain. Her mobility

was significantly limited at that point, and while she had been getting around with a manual

wheelchair, she was in the process of applying for a motorized wheelchair. On her patient intake

form, when asked by Dr. Arkins's office to describe the areas of her body in which she was

experiencing pain that day, Messier identified her posterior neck, shoulders, mid and lower back,

lower extremities, and her anterior forearms. In response to those complaints and following his

examination, Dr. Arkins recommended treatment by spinal injections.[4]

---

[3] The Findings in this paragraph are taken, verbatim for the most part, from ¶¶ 29 and 32-37 of the statement of Stipulated Uncontroverted Facts appearing in Part IX.A. of the parties' Joint Trial Memorandum [Doc. 33].

[4] The Findings in this paragraph are taken, verbatim for the most part, from ¶¶ 38-40 of the Stipulated Uncontroverted Facts.

38. From at least 2002, Messier had complained of left leg swelling during and due to humid and wet weather during the summer. In 2003, she stated that prolonged wet weather affected her hip and that her left leg swells with dampness. In 2007, Messier complained of left leg swelling, and again of left lower extremity swelling a few days later. And on June 11, 2008, less than a month before the ferry collision on July 2, Messier complained of left leg swelling due to the humid weather.[5]

39. Between 2001 and the first months of 2008, prior to the collision, Renee Messier underwent frequent sessions with physical therapists, principally Crossroads Physical Therapy, L.L.C. of Columbia, Connecticut. Crossroads' voluminous records concerning Messier constitute Defendants' Exhibit 506 at trial. For the most part, these documents consist of daily treatment records, which are single-page forms containing body sketches, and entries under several captions ("Subjective Report"; "Objective"; "Comments – Results of Rx Session"; "Pt. Prognosis from Rx Session" and the like). The handwritten notations on these forms, added by a physical therapist, are not self-explanatory, at least to a lay reader, and no testimony was offered to explain them. In ¶¶ 44-49 of their Proposed Findings of Fact and Conclusions of Law [Doc. 34] Defendants' Counsel undertake to interpret the Crossroads therapists' notations describing Messier's "comments" on that day (counsel describe them as "complaints"), as in: "Mrs. Messier has complained of, and/or received treatment for, right shoulder pain numerous times" (¶ 47), followed by a series of references to daily treatment records. For a fact finder, the more useful parts of the Crossroads records are found in the intermittent typed status reports which Crossroads sent to Messier's family physicians' office. The

_____

[5] The Findings in this paragraph are taken, verbatim for the most part, from ¶ 41 of the Stipulated Uncontroverted Facts.

22

first of these reports in Ex. 506 is dated May 16, 2003; the last is dated December 6, 2007.  Each

report begins, under the caption "Subjective," with a summary of how Messier described her own

current condition.  These self-evaluations evidence an overall improvement, albeit with set-backs

interspersed.  I will quote the last two reports.  September 25, 2007: "Renee has reported that she has

been doing well with decreased complaints of low back pain and increased ability to perform ADL's.

She has stated that she wants to get back to the gym."  December 6, 2007: "Renee has reported that

her right-sided low back pain has been doing better."  The record contains no further letter report

prior to the ferry collision on July 2, 2008.

40.  I find that notwithstanding this decidedly difficult and challenging medical past, by the

end of June 2008, just before the vessel collision in suit, Renee Messier had through determination

and hard work improved her condition in striking ways.  Dr. Heather Sullivan, Messier's primary

care physician, gave persuasive evidence on these points.  As I have previously observed, Dr.

Sullivan was an impressive witness.  She is board certified in family medicine, joined a family

medicine practice in Putnam, Connecticut in 1986, and took on Renee Messier as a patient in 1988,

when Messier was 24 years old.  Dr. Sullivan interrupted her practice during the years 1995 through

2003 to work as a hospice physician, then returned to that practice and resumed her care of Messier

(who in the interim had been cared for by other members of the family practice group).  Dr. Sullivan

clearly admires and cares *about* Renee Messier, as well as cares *for* her, but Sullivan's testimony on

medical issues was dispassionate, professional, articulate, well-reasoned and entirely credible.

Asked by Plaintiff's counsel for her impressions of Messier from the beginning of their physician-

patient relationship, Dr. Sullivan responded:

> A.  She has always walked, since I've known her, with a significant

23

limp because of all of the ramifications of her cancer and then the radiation. A lot of muscle weakness in the left leg. She really has no quadriceps strength to lift her left thigh. So her gait, her walk is asymmetric. It's not even keeled.

She had a good attitude. She was remarkably positive about life. She didn't seem to feel that she'd been a victim. She just kept going. And what I was impressed by at the time was that she worked very hard at keeping her health, having worked her way back from this paralysis and from being so young and having so many treatments.

Tr. Vol. 1 p.m. at 26. Asked by counsel about Messier's capabilities in "the first part of 2008," "what she could do and not do," Dr. Sullivan replied at some length and I will quote it at that length, because I think this testimony is important:

A. Well, she certainly still has and will always have the limitations of her spine and her left lower extremity. But in spite of that, she had really worked herself into good condition. She had really been purposefully doing a lot of things at the gym, things that maybe you and I would think were not that impressive, but for her background are.

And she'd had to retire a few years before that. I think about seven years before that because her job was too rough on her back pain. But she, I think, took that chance to really maximize her health.

So at that point, she still had the limp but she was pretty strong. She was lifting her scooter in and out of the car, which for her was key, because she can't be on her feet for more than about fifteen, twenty minutes most of the time. And to get around and be independent, she had to be able to do that. So, she was doing that.

She was lifting, you know, pretty decently heavy bars, upper body weight, which has always been what she depends on because of her lower extremity problem. So, she's dependent on upper body strength.

She was very positive. And one of the physical therapy notes talked about that she was probably in the best condition in terms of balance and strength that she'd been since they had seen her.

24

Tr. Vol. 1 p.m. 27-28.

41.   Renee Messier gave a similar account of her pre-collision physical and medical condition.  Asked on direct examination to describe her "medical condition in general between 2001 and the summer of 2008," Messier testified that "I was fairly healthy.  I just had mobility issues," her symptoms being: "My low back would hurt.  My legs would bother me, strengthwise."  Tr. Vol. 1 a.m. 36.  During this period Messier consulted Dr. Sullivan, her family doctor, and a chiropractor. At their recommendation she had "physical therapy consistently between the beginning of 2000 and the middle of 2008," the purpose of the therapy being "for me to get – strengthen my core, try to get my muscles back looser and stronger, and try to reduce the spasms and all the effects from having a very strict schedule."  Tr. 37.  Messier's condition improved over time.  With respect to the physicians and therapists treating her, Messier testified on direct examination:

> Q.  What was your purpose at this time in seeing these folks, Ms. Messier?
>
> A.  My purpose was to keep mobile and be as healthy and strong as I could be to keep carrying out my daily activities.
>
> Q.  Okay.  That leads us right to our next area.  Around the middle of 2008, let's say for the whole first half of 2008, how was your mobility?
>
> A.  I was actually at the most strongest I've felt in years.  I was doing very well.
>
> Q.  Okay.  And follow up on that.  What do you mean by that?
>
> A.  I had – for about a year, year and a half, I went to our local gym and I was doing classes.  And I was working out in the gym as well. So, I had really strengthened my core.  So, I was feeling very stable and very strong.

Tr. 42.  Messier's self-appraisal echoes that of Dr. Sullivan, quoted *supra*: that by mid-summer in

25

2008, Messier "had really worked herself into good condition," prompting a notation by one of her physical therapists that Messier "was probably in the best condition in terms of balance and strength that she'd been since they had seen her."

42.   That improvement in Messier's overall condition by the beginning of July in 2008 was manifest, although during the several previous years she required the assistance of different devices in walking  distances.  She testified:

> Q.  How did you get around in the first half of 2008, Ms. Messier?
>
> A.  Over the previous years, it was getting harder for me to walk any distance.  And I don't remember the year, but I had to get a manual wheelchair.  So, then I would use my wheelchair to go to the malls, or if we went to take a walk, if we went down to the park for a walk, anything with a long distance.
>
> If we went, like, to a concert or something, you had to park, I would use my wheelchair.  And then after that, the wheelchair got to be a burden.  So, I got a motorized scooter.  So, it gave me more independence.

Tr. 45.

43.   Defendants' theory of the case is that Renee Messier did not suffer any injury as a result of the collision between the ferry and the Coast Guard cutter, and accordingly is not entitled to recover any damages from them.  In making that assertion, Defendants place an unsurprising and entirely reasonable emphasis upon Messier's several prior surgeries and the assorted aches, pains and limitations she has endured since childhood.  However, based upon a review of all the evidence in the record, I find that the vessel collision did in fact cause Messier an injury which can be identified and, to some degree at least, quantified.

44.   The first time Dr. Sullivan saw Messier after the July 2, 2008 collision was on October

26

17.  Dr. Sullivan testified that during the October 17 office visit, Messier said of the collision: "She did not hit the ground, but only because she held on so strongly with her right hand.  And as a result, she developed pretty severe right shoulder pain."  Tr. Vol. 1 p.m. 41.  According to Dr. Sullivan, during the weeks prior to the October 17 visit Messier "had been seeing a physical therapist and a chiropractor who did just gentle manipulation, trying to improve her shoulder pain."  *Id*.  That represented a new sort of therapy for Messier; Dr. Sullivan testified:

> Q.  As her primary care physician, Dr. Sullivan, in your mind, what was the purpose of the physical therapy that she was going through immediately preceding July 2, 2008?  What was all that about?
>
> A.  That was to maintain – it was really maintenance.  This was not for treating injuries.  It's something that Renee had done for a long time.  She had always had a few groups that she pulled in, like, Therapeutic Enterprises, occupational therapists and the physical therapy groups.
>
> She tried to improve her balance, improve her strength, be able to live life in a somewhat normal fashion, and be part of life, and she'd been doing that for a long time.  So, that's really probably going to be her whole life, she's going to need that kind of thing just to maintain.
>
> Q.  Okay. And so the new physical therapy, how is that different?
>
> A.  They were specifically working on the right shoulder pain, trying to reduce pain, increase movement.
>
> Q.  Different from the maintenance that you had just mentioned?
>
> A.  Yes, oh, yes.  I don't think she'd ever had a right shoulder joint injury.  She had had neck trouble, low back trouble.  But I don't have any record of her having a right shoulder injury at all.

Tr. Vol. 1 p.m. 34-35.  This is credible testimony, and I accept its accuracy.

45.  Renee Messier testified that prior to July 2, 2008, she had had "issues back around my shoulder blades, muscular and aches, and depending on my activities and what I've done.  My actual

shoulder joint, neither one of my shoulders have ever bothered me." Tr. Vol. 1 a.m. 55. That changed after the vessel collision. On September 16, 2009, Messier was seen by David LaChance, an Advanced Practice Registered Nurse in the office of Dr. Biren Chokshi, an orthopedic surgeon. She returned to Dr. Chokshi's office on October 29, 2009, and again on November 17, 2009. On October 12, 2009, Messier saw Dr. Anthony Alessi, a neurologist. On January 23, 2011, Messier saw Dr. Stephen Scarangella, a sports orthopedic physician, who had treated Messier previously for unrelated tendinitis. Several MRIs and other tests and procedures were performed during these consultations. Messier testified at trial: "Q. What was the circumstances that you went to see them? A. I was trying to find out why I was still having extreme pain in my limbs, especially my right arm." Tr. 75.

46. In March of 2011, Messier was still suffering from pain in the right shoulder. On her own initiative, she consulted Dr. Anbari. Dr. Anbari first saw Renee Messier on March 24, 2011.

47. In ¶ 12 of these Findings, I quoted Dr. Anbari's account of what Messier told him about the vessel collision and how it caused her injury. It is now necessary to consider in detail Dr. Anbari's testimony, by videotaped deposition shown at trial, with respect to his treatment of Messier.

48. Dr. Anbari treated Messier's right shoulder by operating on it. After examining Messier and taking her history, Dr. Anbari suspected that "she may have had a tear in the labrum," soft tissue "that surrounds the [shoulder] socket" which "works deep in the joint and to provide more stability in the joint." In Messier's case, Dr. Anbari testified, "I suspected from her injury that – from history and physical exam – she may have had a tear there." Dep. Tr. 16. Dr. Anbari's diagnosis was "a labral tear of her right shoulder, and impingement," which occurs if "the ball of the joint ends up articulating or touching or hitting hard against the roof of the shoulder." Dep. Tr. 18. In his

testimony, Dr. Anbari described the reason for and nature of the surgery he performed on Renee

Messier:

> Q.  And so what did you do to go about treating these two things, Dr. Anbari?
>
> A.  She had already done physical therapy, from her history intake, when she saw Dr. Chokshi and Dr. Scarangella, which are two surgeons who saw her two years before I saw her.
>
> She did physical therapy, but she did not improve well with it. Typically speaking, when somebody presents with symptoms like that, you try things like physical therapy.  I offered her cortisone injections, which is sometimes a way to help mitigate some of the symptoms.  She did not want it.
>
> She came to really see me to have her shoulder fixed because she was having a hard time using it and she pretty much was having pain constantly for two years after the injury from her history intake.
>
> Q.  What did you do to treat it?
>
> A.  I did an arthroscopic surgery on her.  Arthroscopic surgery means using small little holes in the joint and putting a camera about the size of this pen into the joint.     And using that, I did cleanup of the tear that she had that was inside her joint.  And then I went to the bone under the roof of the shoulder called the acromion and I shaved it down so it's flat.
>
> Q.  And did you find a labral tear?
>
> A.  I did.  It was – There's several different types of labral tears. She had a type one.  Which basically means a tear that does not go all the way through, but a piece of it can catch inside the joint and cause pain.

Dep. Tr. 19-20.

49.  Since the main thrust of Messier's claim against Defendants for personal injury relates

to her right shoulder and Dr. Anbari's corrective surgery upon that joint, it is not surprising that

Defendants culled the Crossroads records, referred to in ¶ 39 of these Findings, for daily therapists' reports that Defendants interpret by saying: "Since the 2004 fall, Mrs. Messier has complained of, and /or received treatment for, right shoulder pain numerous times."  Defendants' Proposed Findings of Fact [Doc. 34] at ¶ 47.   That paragraph of Defendants' Proposed Findings contains references to 36 separate therapy sessions Messier underwent at Crossroads, all prior to the vessel collision.   The earliest session was on December 1, 2004.  The latest was on February 18, 2008 (over four months before the ferry collision).   Arranging these sessions by calendar year, the following breakdown results: 2004: 6 physical therapy sessions purportedly for "right shoulder pain";  2005: 17 sessions; 2006: 9 sessions; 2007: 3 sessions; 2008: 1 session.  This pattern of physical therapy sessions does not support Defendants' theory of the case that Messier was suffering from severe and chronic pain in her right shoulder at the time of the collision on July 2, 2008.   On the contrary: the pattern supports the inference, which I draw, that Messier's fall in 2004 caused temporary pain to her right shoulder that had largely abated by July 2008.  The pattern is also consistent with the testimony of Messier and Dr. Sullivan, that by the beginning of July in 2008 Messier had improved her overall physical condition in significant ways.  The apparent diminishing of discomfort in the right shoulder by July 2008 may be contrasted with the surgeon, Dr. Anbari's examination of Messier in March 2011: "I could tell based on her presentation exam that her right shoulder was definitely painful, very painful for overhead type activities and lifting activities . . . " Dep. Tr. 28.

50.   As recited in ¶ 48 of these Findings, in March 2011 Dr. Anbari found and repaired a "type one" labral tear in Messier's right shoulder.  During the medical evidence adduced at trial, that condition was also referred to as a "SLAP tear." During his testimony, on cross-examination by counsel for the Government, Dr. Anbari described the nature of a Type I (or "one") SLAP tear:

    A. I think the best way I would describe it is it's not a full thickness tear. The labrum, it's like a gasket that goes around the socket. You think of the socket as pretty much like a circle. Where my finger is is where the gasket goes around it. It surrounds the entire socket. That helps stabilize the shoulder. It deepens the socket with soft tissue that makes it more stable.

    When you have a full thickness tear, meaning the tissue can slide back and forth, that would be Grade II or III or IV. Grade I is when you have a tear that does not make it all the way to the end where you actually have to reattach it back in place.

    *     *     *     *     *

    Actually, the photograph I have just shows a piece of tissue that was actually cut off – not cut off, but actually draping into the joint.

    They're all considered a Type I SLAP tear. I may have just said it was frayed, but actually it was – it was – it's sort of an incomplete tear that goes across the tissue.

    Q. Being Type I, that would be the most modest type of tear that you would typically deal with?

    A. Yes.

Dep. Tr. 41-42. On direct examination, Dr. Anbari had explained what we may call the causal mechanics of the vessel collision and Messier's shoulder injury:

    A. When somebody develops a traction injury – And to the best of my understanding, she was holding onto the railing to prevent herself from falling. The impact of the injury basically pulled her body weight away from the railing and her arm pulled back. That's her right arm. That's usually consistent with an injury inside the shoulder complex, the shoulder joint, and I suspect she may have had a tear in the labrum.

Dep. Tr. 15-16. And, as the subsequent surgery revealed, Messier did indeed have a Type I SLAP tear in the labrum of her right shoulder.

51.   Dr. Anbari's surgery on Renee Messier was successful.  He testified:

> Q.  What did you have her do after the surgery, if anything?
>
>  A.  She did physical therapy.  Everybody after shoulder surgery
> undergoes physical therapy.  And she did well with the surgery, she
> did well with the physical therapy.  She ended up recovering a lot of
> the function she had in her shoulder prior.
>
>  She continued to have this vague pain going down her arm, which,
> again, she's had a very long history of cervical and thoracic spine.
> Cervical meaning the neck and thoracic spine meaning the back of the
> thorax.  And I think that's probably just residual from previous to the
> injury.  But the shoulder pain ended up doing really well.

Dep. Tr. 23-24.  Asked on direct examination whether in his opinion "the injuries for which you

treated Renee Messier will be permanent, Dr. Anbari responded in the negative: "I do not believe

they will be permanent," adding: "I do believe that her treatment for shoulder was successful, she did

great with it."  *Id.* at 31.

52.  That favorable evaluation echoes that of Dr. Sullivan, Messier's primary care physician,

who testified on direct examination:

> Q.  In regards to Ms. Messier, is it accurate to say that before the
> ferry collision on July 2, 2008, medically you established a baseline
> for what her condition was and what she could and couldn't do?
>
>  A.  Yes.
>
> *       *       *       *       *
>
>  Q.  This may be an impossible question, but if returning to baseline
> would be like 100 percent recovery, whereabout is she, would you
> say?  And if you can't say, I understand.
>
>  A.  I would estimate 85.

Tr. Vol. 1 p.m. 42-43.  Dr. Sullivan attributed the amount of time required for Messier's recovery to

32

these factors:

> A. She's done much better. She has improved over the years. But it was two years before she even had the right shoulder repaired. So all of that time her other muscles were not getting used as well. So they had atrophied and her sense of balance was not as good. And that takes a long time to get back. It takes a long time to get the strength of the right arm back after the shoulder surgery. Everyone is different. But certainly someone who has had Ewing's sarcoma and radiation and had all those changes in their body is going to take a little bit longer.

*Id.* at 43. Asked on redirect examination whether she had an opinion if Messier "will ever be able to

reach her baseline," Dr. Sullivan responded: "I would say I'm 75 percent sure she will." *Id.* at 54.

53. In these Findings, where I quote the testimony of witnesses, lay or medical, I do so

because I assess those witnesses as credible and accept their testimony as accurate and truthful.

Based on the trial evidence, and the findings stated or implicit in the preceding Findings, I find that

the impact of the collision on July 2, 2008 between the ferry BLOCK ISLAND, on which Messier

was riding as a passenger, and the Coast Guard Cutter MORRO BAY caused an injury to Messier's

right shoulder, the principal feature of which was a SLAP Type I partial tear of the labrum. Several

aspects of the evidence require that finding.

54. First, that particular injury is consistent with the mechanics of the collision impact, as

revealed by the evidence. I have found that at the moment of impact, Messier was holding with her

right hand onto the waist-high railing which ran along the inboard wall of the ferry's starboard side

passenger catwalk. She was facing across the width of the passageway, toward the open window-

like apertures in the outboard starboard side of the vessel. In consequence, Messier's left side was

positioned looking forward on the ferry, and her right side was positioned looking aft. While the

ferry captain's *in extremis* engine maneuver reduced the ferry's speed, she had sufficient forward way

at impact to jolt the passengers, and subject Messier to the force of momentum, by which I mean her

body continued to move forward and to her left, restrained only by the force with which Messier

clung with her right arm to the handrail.[6]

55.   Second, the medical evidence taken as a whole compels the finding that the collision

impact caused the injury of which Messier complains in this action.   Dr. Sullivan and Dr. Anbari

each opined that the impact of the vessel collision was  a competent and the likely cause of the injury

to Messier's right shoulder.  *See* Sullivan, Tr. Vol. 1 p.m. 52-53 (the collision "did cause the injuries"

. . . "I would say 100 percent sure."); Anbari, Dep. Tr. 30-31 ("I believe with a high degree of

medical probability actually – not just a reasonable degree – that with a lack of any previous history

of shoulder pain and impingement pain and the pain she presented with afterwards, that the injury

she sustained on the boat, especially with a traction component in it, is what led to her coming to see

---

[6]  These physical facts implicate Newton's First Law, often stated  as: "An object at rest
stays at rest and an object in motion stays in motion with the same speed and in the same direction
unless acted upon by an unbalanced force." www.physicsclassroom.com/Class/newtlaws/u2l1a.cfm
(visited July 1, 2013). That research authority,  under the caption "Everyday Applications of
Newton's First Law," says: "Have you ever experienced inertia (resisting changes in your state of
motion) in an automobile while it is braking to a stop?  The force of the road on the locked wheels
provides the unbalanced force to change the car's state of motion, yet there is no unbalanced force
to change your own state of motion.  Thus, you continue in motion, sliding along the seat in forward
motion.  A person in motion stays in motion with the same speed and in the same direction . . .
unless <u>acted upon by the unbalanced force</u> of a seatbelt.  Yes! Seat belts are used to provide safety
for passengers whose motion is governed by Newton's laws."  *Id.*  Newton's laws are as applicable
to vessels on  navigable waters as they are to automobiles on highways.  In the case at bar, Renee
Messier and the ferry BLOCK ISLAND shared the same state of motion until the impact of collision
(the functional equivalent of braking to a stop) changed the vessel's state of motion but left the state
of motion of Messier's body unchanged until it was arrested by her right hand's grip upon the
handrail.  That grip, the medical evidence shows, transmitted force along the right arm to the right
shoulder, a competent and foreseeable cause of a traction injury such as a torn labrum, which I find
is what occurred.

me, what required surgery, and all the treatment that followed after that."). Dr. Anbari's reasoning is consistent with the medical evidence. While Messier certainly had a complicated medical past, her extensive medical file contains no indication of a pre-collision traumatic cause of pain specifically in her right shoulder. The physical therapy records indicate the existence of right shoulder pain attendant upon a fall Messier had in 2004, but also show that this pain had largely abated before the collision: *see* ¶ 49, *supra*. Dr. Anbari identified the vessel collision as the likely cause of the right shoulder pain Messier presented to him; he operated on that shoulder and discovered a Type I SLAP tear in the labrum, an injury consistent with the mechanics of the collision's physical effect upon Messier; Dr. Anbari repaired that tear and related conditions surgically; and Messier's pain was greatly improved. This medical evidence leads the court to the Finding in ¶ 53.

56. In my review of the medical evidence, I have considered the testimony of the Defendants' expert witness, Kenneth R. Alleyne, M.D. Dr. Alleyne was a highly qualified and impressive witness. He is a board certified orthopaedic surgeon whose group practice is named Eastern Orthopaedics and Sports Medicine, of South Windsor, Connecticut. Dr. Alleyne is a clinical assistant professor at the University of Connecticut School of Medicine. He has testified as an expert in previous civil trials, but he is primarily a practicing physician. Renee Messier has never been a patient of Dr. Alleyne's, and he has never treated or examined her. The opinions Dr. Alleyne expressed about the nature, extent and causes of Messier's physical conditions and limitations were based entirely upon his examination of Messier's medical file, made available to him through pre-trial discovery.

57. In preparation for his testimony, Dr. Alleyne had reviewed pre-collision MRIs and other

diagnostic tests contained in Messier's medical file, together with the comments of various physicians (orthopedists, radiologists,, neurologists) about those tests, and was taken through them during direct examination by Government counsel.  Dr. Alleyne's opinions may fairly be summarized as denying any causal connection between the vessel collision impact and any injury, pain, discomfort, or limiting condition experienced by Messier at any time subsequent to the collision. He ascribed those afflictions to conditions entirely separate from and independent of the collision. The following testimony, during Government counsel's direct examination of Dr. Alleyne, is illustrative:

> Q.  As of now, following the accident, what do you believe, based on your review of the record, caused Ms. Messier to feel any of the – to suffer the complaints that she had after the accident?
>
> A.  Surgical degenerative disc disease.
>
> Q.  And that caused which symptoms?
>
> A. The arm symptom.
>
> Q.  Why do you say?
>
> A.  The levels were affected on the cervical spine, were consistent with the levels of complaint.
>
> Q.  What do you base that on?
>
> A. The MRIs.
>
> Q.  Is there any objective medical evidence to suggest otherwise?
>
> A.  No.
>
> Q.  So now, moving from there.  How about exacerbation of preexisting condition.  Is there any objective medical evidence that suggests that was an exacerbation to any preexisting medical condition?

36

A.  No, the objective evidence of the MRI imaging in 2005, 2008 show an increase in a degenerative process, but not an acute event.

Q.  What about the history of her neck pain, numbness, shoulder pain?

A.  Consistent with what was being experienced pre-injury.

Tr. Vol. 2 p.m. 82-83.

58.  During his testimony, and in response to questions posed by counsel for both the Government and the Plaintiff, Dr. Alleyne focused upon an MRI procedure conducted on November 12, 2009 at Day Kimball Hospital in Putnam, Connecticut.  This MRI was ordered by Dr. Biren Chokshi, an orthopedist and one of several physicians and therapists Messier contacted subsequent to the ferry collision in July 2008 in an effort to obtain a diagnosis of and treatment for the severe right shoulder pain she was experiencing.  The three-page MRI report signed by the interpreting physician, Dr. Prasanta Karak, bears Bates number PL09 000013-15 in the medical file admitted as a Plaintiff's Exhibit at the trial.  Dr. Chokshi's two-page analysis of that report, dated November 17, 2009, bears Bates numbers PL09 000016-17.  The MRI report, under the caption "PROCEDURE REASON," STATES: "RT SHOULDER INJURY? SLAP LESION PAIN."  The "CLINICAL HISTORY" entry reads: "Right shoulder injury, suspected SLAP lesion, right shoulder pain."  Dr. Karak's interpretation reciting the procedures follows, and then says at page three (PL09 000015):

There is a focal tiny area of contrast extension into the superior glenoid labrum identified in only one image (image 8, series 3) most likely represents sublabral recess.  However, possibility of small labral tear, as you know, cannot be absolutely excluded based on this imaging appearance alone.  The remainder of the labrum, however, appeared intact.

37

Dr. Chokshi considered this MRI report and noted his own impression (PL09 000016):

> Right shoulder rotator cuff impingement syndrome, AC joint arthritis.
> No SLAP lesion but there is multidirectional instability.  The bilateral
> hands have carpal tunnel syndrome, moderate to severe.

Dr. Chokshi urged Messier to consider carpal tunnel surgery, but she demurred and pressed her

inquiries elsewhere, eventually coming under the care of Dr. Anbari.

59.   During Government counsel's redirect examination of Dr. Alleyne, this exchange

occurred with respect to the 2009 MRI ordered by Dr. Chokshi:

> Q.  Mr. Swain [counsel for Plaintiff] brought up the 2009 MRI from
> Dr. Chokshi's MRI.  You looked at those actual images yourself?
>
> A.  Correct.
>
> Q.  What is your opinion regarding the small indentation on –
> regarding the small indication in the labrum area?
>
> A.  Yes, the indentation.  My opinion doesn't change.  That was a
> sublabral recess, which is a normal anatomic finding, which was
> borne out actually at surgery because there was no tear in that region.
>
> Q.  And who gave – I'm sorry, go ahead.
>
> A.  Meaning that the indication from the MRI arthrogram of a
> sublabral recess and it said it could not rule out a tear.  My review of
> the MRI is that that wasn't a Type 2 SLAP tear.  That was a sublabral
> recess.  And in fact, when Dr. Anbari carried out the surgery he didn't
> find a Type 2 SLAP tear.
>
> *      *      *      *      *
>
> Q.  So what is your opinion of Dr. Anbari's reading of the same
> images, of that same November 2009 MRI of her shoulder that he
> saw a SLAP 1 lesion?
>
> A.  He saw things that I didn't see.  But you know, it's his
> interpretation.  My interpretation, doing a lot of shoulders, is that this
> was a negative film.

Tr. Vol. 2 p.m. 123-124.  This passage prompts two comments.  First, Dr. Alleyne's reference to a

"Type 2 SLAP tear" is puzzling; no one suggested the presence of an injury of that magnitude.

Second, the more probative evidence is found in what Dr. Anbari actually found during his surgery

on Messier, which trumps any differences in different physicians' interpretations of an MRI.  That

is the subject to which Plaintiff's counsel promptly returned in his re-cross examination of Dr.

Alleyne:

> Q.  Dr. Alleyne, you've reviewed the surgical record of Dr. Anbari?
>
> A.  I did.
>
> Q.  Didn't Dr. Anbari, in his surgical record, say that he found a SLAP 1 tear at surgery?
>
> A.  Right.  That wasn't his diagnosis going in.
>
> Q.  But at the surgery he found a SLAP 1 tear?
>
> A.  Correct.

*Id*. 125.

60.  Dr. Alleyne restated his conclusion, in somewhat different terms, when he responded to

questions I put to him at the end of his testimony.  Asked by the Court to define a "traction injury,"

Dr. Alleyn said that "before we had the ability to operate" on certain injuries, "the principle of

traction used in orthopedics was really to figure out a way to put a longitudinal force on a bone to

line it up," a methodology "we used to treat patients for months and months in hospitals."  Tr. Vol.

2 p.m. 126.  This exchange then occurred:

> A.  Similarly, in an extremity, a traction injury would be a longitudinal force on an extremity.
>
> THE COURT: Then my question is this.  On the basis of your

examination of the records and everything that you've done to prepare you for your testimony, do you have an opinion, which you can express with a reasonable degree of medical certainty, to use that phrase, that as a result of the incident, the episode we're dealing with, Mrs. Messier suffered a right shoulder traction injury. Have you an opinion on that conclusion?

A. I do.

THE COURT: What is it?

A. There was no evidence that there was a right shoulder traction injury, your Honor.

*Id*. 126-127.

61. While Dr. Alleyne was a well qualified and articulate expert witness, I am unable to accept his conclusions, given the totality of the medical evidence. Dr. Alleyne never saw, examined or treated Renee Messier. I do not mean that in a pejorative sense, it is only a statement of fact, but I find more probative value in the impressions and opinions of physicians with personal knowledge of Messier's condition. The impression formed by Dr. Sullivan, Renee Messier's primary care giver, when she first examined Messier after the collision was that "the description [of the event] and her symptoms were consistent with a traction injury to the right shoulder." ¶ 11, *supra*. Dr Anbari formed the same impression when he examined Messier, and then proceeded to confirm the diagnosis by performing arthroscopic surgery on her right shoulder and discovering a Type I SLAP tear of the labrum, which he repaired. The medical evidence makes it clear that this is the sort of injury that can result from a longitudinal force placed upon an individual's extremity, such as Messier's right arm; and the manner in which the collision impact affected Messier generated precisely that sort of force. Dr. Anbari and Dr. Alleyne agreed in their testimony that natural degeneration of the body can lead to this sort of condition, and Renee Messier is not a stranger to the

40

adverse effects of arthritis or age; but the pain in her right shoulder, commencing right after the collision and different in nature and severity from earlier shoulder pain which by that time had abated, is persuasive evidence that the collision caused the injury complained of in this action.

62.  In addition to the medical evidence, there is evidence of post-collision changes in what one may call the Messiers' "quality of life." Renee and Gregory Messier testified, and I accept their testimony on the points, that over the years prior to the vessel collision, they had frequently visited their friends, the Carpenters, both on the Carpenters' boat at Block Island and at a vacation home the Carpenters had in northern New England.  Renee Messier's persistent discomfort after the collision put an end to visits to the Carpenters at that vacation home, although the Messiers continued their visits to them in Block Island.  Closer to Plaintiff's home, Gregory Messier had for years been a motorcycle enthusiast, and owned a large and powerful one.  The Messiers enjoyed getting  on Gregory's motorcycle and taking day trips, by themselves or with other cycling friends and aficionados.  After the collision, Renee Messier's persistent discomfort put an and to those adventures on the open road, and Gregory Messier eventually sold his motorcycle.  His  testimony was restrained, but one can readily sense the regret with which Gregory parted company with that motorized companion.

63.  These changes in life style, established by the evidence and recounted in the preceding paragraph, are not included in these Findings to lay the foundation for an award to Renee Messier of damages for mental anguish; it is not clear that the complaint asserts that particular claim.  Rather, this evidence was received as probative of the core contested issue: Whether the collision impact caused Renee Messier any injury.  To borrow the title of Joseph Heller's second novel: the diminutions in the Messiers' social and recreational activities tend to show that *Something Happened*

41

to Renee Messier when the BLOCK ISLAND and MORRO BAY collided.[7]

64.  The collision between the vessels caused an injury to Renee Messier's right shoulder. She underwent successful surgery for that injury, and has largely recovered from its effects.  At all times relevant to this action, Messier suffered from limiting and painful conditions resulting from causes unrelated to the collision, suffers from those conditions today, and, one concludes with regret, probably always will.

65.  Plaintiff has not proved that she has sustained any permanent injury as a result of the collision.  The testimony of Dr. Anbari and Dr. Sullivan, quoted in ¶¶ 51 and 52, preclude any award for permanent injury.

66.  Plaintiff asserts a claim for future damages for pain and suffering.  The medical evidence in support of that particular claim consists entirely of a theory articulated by Dr. Anbari.  After Dr. Anbari described his successful surgery on Renee Messier's right shoulder, this exchange occurred during questioning by Plaintiff's counsel:

> Q.  All right.  Has she started to complain or has she complained to you about problems in her left shoulder, the opposite shoulder?
>
> A.  She did.  And it became more of an issue back in 2012, last year.  We did an MRI on it, I believe in April, and then we repeated again in October. . . . [W]hen she came to present with me, obviously her right shoulder was a lot more involved.  We didn't really talk about the left shoulder until after the right shoulder was better.
>
> Q.  Is this something that typically happens in patients with shoulder pain on one side?
>
> A.  It can. . . . I could tell based on her presentation exam that her

_____

[7]  *Something Happened*  is  the  title of the second novel written by the American satirical writer, Joseph Heller.  His first and more popular novel was *Catch-22*, a phrase that has passed into the language.

right shoulder was definitely painful, very painful for overhead type activities and lifting activities, that I believe she may have done a little bit more on the left side. The left side did not present with the acuity that it did until the right shoulder was feeling better, and it presented with similar symptoms, meaning symptoms with pain, with overhead type activities, lifting type of things, pain at night, which are all consistent with bursitis.

Q. Are those findings, in your experience, likely to follow a history like this where there's an injury to the right shoulder and then a transfer of problems to the other side?

A. It's very possible. . . . I do see it frequently in patients who rely on one shoulder as opposed to both, when one shoulder is injured, and they end up having this, quote/unquote, "transfer of pain." It's not because the left shoulder was necessarily injured, but, you know, relying on one versus the other – versus both can sometimes cause increasing pain. And I believe in her case, because she had – two years before, she had the shoulder taken care of, it's very reasonable to say her left shoulder was affected by that.

Dep. Tr. 27-30. Dr. Anbari testified in response to the questions of Plaintiff's counsel that in his opinion, "with a lack of any previous history of shoulder pain and impingement pain and the pain she presented with afterwards, that the injury she sustained on the boat, especially with a traction component in it, is what led her coming to see me, what required surgery, and all the treatment that followed after that." Counsel followed up, and this exchange occurred:

Q. Does that include the injury to the left shoulder that you've described to us?

A. If you believe the transfer of pain, which I do, yes, absolutely.

Dep. Tr. 30-31. Dr. Anbari also predicted the necessity of surgery on Messier's left shoulder: "I think eventually she is going to need the same surgery she had on the right side, which turned out to be a great success for her, and I think she'll probably require that as well." Dep. Tr. 33.

43

67.   Dr. Anbari's theory of "transfer of pain" from Messier's right shoulder to her left shoulder, while plausible, falls well short of proof that the vessel collision caused an injury to Messier's left shoulder for which the Defendants must respond in present or future damages.  One may reasonably infer that any pain Messier has or is feeling in her left shoulder is of a lesser degree than that experienced in the right shoulder after the collision: she has not had surgery on the left shoulder, and there is no evidence that she presently plans or contemplates such a procedure.  I accept Dr. Anbari's testimony that in 2012 Messier began to complain to him about left shoulder pain, but given the extent and nature of her pre-existing conditions, there is insufficient evidence to exclude those conditions as the cause of present left shoulder discomfort.  In that regard, Messier's right-shoulder pain may be distinguished from left-shoulder pain by the fact that the mechanics of the injury, described in ¶¶ 54 and 55, *supra*, imposed upon the right shoulder the sort of traction force that causes (and did cause) injury to that shoulder's components.  This cannot be said of the left shoulder, and so the claim for future pain and suffering depends upon the theory of pain being transferred over time from the right shoulder to the left, as Messier compensated for not using the right shoulder and over-using the left one.  I interpret Dr. Anbari as saying that such a transfer of pain is *possible*.  *Au fond,* Dr. Anbari's testimony on this point is speculative and conjectural: informed conjecture, to be sure, but conjectural and speculative nonetheless.  Viewing that medical testimony through the prism of the law, Defendants cannot be cast in damages for Messier's left-shoulder pain unless she proved it is more likely than not that the collision impact caused that pain.  Given her pre-existing conditions, that has not been proven.

### III.  CONCLUSIONS OF LAW

1.  The Court has subject matter over this action and personal jurisdiction over the parties. Subject matter jurisdiction over Plaintiff's claim against the United States of America is conferred by the Suits in Admiralty Act and the Public Vessels Act.  Subject matter jurisdiction over Plaintiff's claim against Interstate Navigation Company is derived from the general maritime law.  Plaintiff does not assert an *in rem* claim against either colliding vessel.  Personal jurisdiction over both Defendants is manifest and uncontested.

2.  As stipulated by Plaintiff and both Defendants, and approved and So Ordered by the Court, Defendant United States and Defendant Interstate Navigation Company are each fifty percent liable for the vessel collision that took place on July 2, 2008, involving the ferry BLOCK ISLAND and the U.S. Coast Guard Cutter MORRO BAY.

3.  It follows from the apportionment of liability recited in the preceding Conclusion of Law that each Defendant is separately liable, without right of indemnity or contribution, for fifty percent of the damages that Plaintiff proved at trial were proximately caused by the collision between the BLOCK ISLAND and the MORRO BAY.

4.  Plaintiff has proved by a preponderance of the evidence that the impact of the collision between those two vessels was the proximate cause of an injury to her right shoulder.

In reaching that Conclusion, I have considered a case cited by the Government for the proposition that Plaintiff should recover nothing in this action: *Thompson v. Consolidated Gas Elec. Light & Power Co.*, 111 F.Supp. 719 (D. Md. 1953), a decision by a leading admiralty jurist, District Judge Chesnut.  While navigating a river in the inter-coastal waterway in 1951, a pleasure yacht received a discharge of electricity from a high voltage cable spanning the river.  Plaintiff Thompson,

the owner and navigator of the yacht, brought an action in admiralty against the power company which maintained the cable,  for damage to the yacht and personal injury to himself.  Judge Chesnut rejected the claim for damage to the yacht for reasons that are not relevant to the case at bar.  The Government cites *Thompson* in Renee Messier's case because Judge Chesnut also held that Thompson had not proved "the accident was the proximate cause of his present subjective symptoms," 111 F.Supp. at 728, and the Government argues Messier does no better.  The cases are similar in that both Messier and Thompson had considerable pre-existing medical histories and conditions.   Messier's pre-incident conditions have been recounted in the Findings of Fact.  Thompson was "a man 56 years of age," whose "physical condition long prior to the accident was unfortunate"; in 1933 he had "an advanced stage of arthritis," by 1938 "was able to walk only in a bodily bent forward condition with the aid of two canes," and in the year prior to the incident in suit "had a bad fall in his home which had further incapacitated him for a considerable period of time." *Id*. at 727-728.

Thompson's theory of the case against the power company was that the electrical charge passing to his yacht left him with severe headaches and other symptoms that he had not had previously.  The reasons for Judge Chesnut's rejection of that claim appear in his opinion:

> The medical evidence as to his present condition and the cause of it is not convincing with reference to any objective findings of the doctors apart from the plaintiff's own statement as to subjective symptoms.  As the burden of proof is on the plaintiff to show that the accident was the proximate cause of his present subjective symptoms, I do not find the evidence affirmatively sufficient to warrant the conclusion that he has suffered any substantial personal injuries from the accident.

111 F.Supp. 728.  The case at bar is quite different.  Messier bears the same burden of proof as

Thompson: to show that the ferry collision was the proximate cause of her severe right shoulder pain. Unlike Thompson's case, there are ample objective findings by doctors to sustain that burden: the examinations of Messier by Drs. Sullivan and Anbari, who diagnosed a probable traction injury to the right shoulder caused by the collision impact, and Dr. Anbari's surgery, which confirmed that diagnosis by discovering and repairing the labral tear.

5.  Accordingly, Plaintiff is entitled to recover money damages from Defendants, consisting of an award for her physical pain and suffering caused by the injury, and the recovery of reasonable medical costs and expenses she incurred as a result of the injury.

6.  Calculation of the amount of pain and suffering borne by Plaintiff as a result of the injury for which Defendants are liable presents mixed questions of law and fact, particularly in light of Plaintiff's extensive and complicated pre-collision medical history.  Those circumstances give rise to the complications Judge Friendly confronted with characteristic perspicacity in *Steinhauser v. Hertz Corp.,* 421 F.2d 1169 (2d Cir. 1970), cited by the Government.

The plaintiff in *Steinhauser* was a 14-year-old girl named Cynthia, who was traveling with her parents in the family car when the car was struck by a car owned by Hertz, the defendant. Although in Judge Friendly's phrase this was a "rather slight accident," 421 F.2d at 1170, the child almost immediately developed acute mental and emotional symptoms, requiring hospitalization and eventually diagnosed as schizophrenia.  She and her parents sued defendant to recover for damages caused by the vehicle collision.  There was medical evidence that during the years prior to the collision, the child had demonstrated symptoms of psychotic tendencies.  On appeal from a jury verdict in defendant's favor, the Second Circuit held that the trial judge erred in charging the jury that "damages could be awarded only if the accident caused the schizophrenic condition but not if

47

Cynthia already had the disease." *Id.* at 1172.  The plaintiffs, Judge Friendly wrote, "could not properly be pinioned on the dilemma of having either to admit that Cynthia was already suffering from acute schizophrenia or to assert that she was wholly without psychotic tendencies."  Rather, plaintiffs were entitled to have "fairly weighed by the jury" the medical evidence that "before the accident Cynthia was *neither* a 'perfectly normal child' *nor* a schizophrenic, but a child with some degree of pathology which was activated into schizophrenia by an emotional trauma although it otherwise might not have blossomed." *Id.*

The Second Circuit begins its concluding paragraph in *Steinhauser* with an offer: "We add a further word that may be of importance on a new trial." *Id.* at 1173.  The first words that follow are Judge Friendly's.  He says: "Although the fact that Cynthia had latent psychotic tendencies would not defeat recovery if the accident was a precipitating cause of schizophrenia, this may have a significant bearing on the amount of damages."  The opinion then furnishes quotations from two cases by way of guidance; quotations that resonate in the case at bar. "It is easily seen that the probability of later death from existing causes for which a defendant was not responsible would probably be an important element in fixing damages, but it is not a defense."[8]  "If a defendant succeeds in establishing that the plaintiff's pre-existing condition was bound to worsen, an appropriate discount should be made for the damages that would have been suffered even in the absence of the defendant's negligence."[9]  Judge Friendly ends *Steinhauser* with a valediction that, one supposes, is intended to reassure future fact finders:

---

[8] 421 F.2d at 1172 (citing and quoting *McCahill v. New York Transp. Co.*, 201 N.Y. 221, 224 (1911)).

[9] 421 F.2d at 1173-1174 (citing and quoting *Evans v. S.J. Groves & Sons Company*, 315 F.2d 335, 347-348 (2d Cir. 1963)) (internal quotation marks and ellipsis omitted).

> It is no answer that exact prediction of Cynthia's future apart from the accident is difficult or even impossible.  However taxing such a problem may be for men who have devoted their lives to psychiatry, it is one for which a jury is ideally suited.

421 F.2d at 1174.

7.  My responsibility in the case at bar is to discount any award to Renee Messier for pain and suffering subsequent to the vessel collision on July 2, 2008: a discount which appropriately reflects the fact that pain and suffering caused by Messier's right shoulder injury, for which Defendants are liable, was inevitably intermingled with pain and suffering resulting from her several pre-existing conditions.  Judge Friendly tells us that for such taxing exercises "a jury is ideally suited."  I am not at all sure this great appellate judge would extend that vote of confidence to trial judges, and I have been known in the past to fail to live up to Second Circuit standards.  Nonetheless, such is my duty under the governing law, and I attempt to discharge it in what follows.

8.  The boundaries of acceptable awards for compensatory damages are easier to state than apply.  *Ismail v. Cohen*, 899 F.2d 183 (2d Cir. 1990), is a typical case: the Second Circuit there said that the standard of appellate review of a jury award for pain and suffering is whether the award "is so high as to shock the judicial conscience and constitute a denial of justice."  A trial judge's order setting aside a jury award as excessive implies that his or her judicial conscience was shocked; the court of appeals will reverse the trial judge's order only where the amount of the jury's award "was clearly within the maximum limit of a reasonable range."  *Id.* at 186 (citations omitted).  Such Second Circuit cases instruct me to award Renee Messier compensatory damages for pain and suffering caused by her right shoulder injury in an amount that falls within the limits of a reasonable range, and will not shock any appellate consciences that may be asked to review the matter.

49

9.  I start with the proposition that this award must be substantial.  That is because immediately prior to the vessel collision on July 2, 2008, Messier had brought herself to as satisfactory and pain-free or reduced a physical condition as she had achieved in some years.  Dr. Sullivan, her primary care physician, had formed that opinion; so did the physical therapists whose progress reports on Messier Dr. Sullivan reviewed.  The collision impact caused a traction injury to Messier's right shoulder which shortly thereafter caused severe, persistent and unprecedented pain to that part of her body.  Messier embarked upon a series of consultations with physicians and therapists to alleviate that pain.  She did not achieve relief until she consulted Dr. Anbari, in March 2011.  Messier should not be faulted, nor her pain and suffering award reduced, on the ground that it took her over two years to find Dr. Anbari.  Dr. Anbari's arthroscopic surgery achieved a "great" result for Messier (to quote his own justified appraisal), and the evidence shows that Messier's severe, collision-caused right shoulder pain lasted three years: early July 2008 to early July 2011.  By that latter date, it is reasonable to suppose that the post-operative therapy attendant upon Dr. Anbari's surgery and the favorable result he achieved had the hoped-for salutary effect upon Messier's collision-induced symptoms.  The Court's award will be for three years of pain and suffering endured by Plaintiff for which Defendants are responsible.

How does a juror or a trial judge place a dollar figure on another person's pain?  That is the imponderable question posed by the law, but an answer must be given, if human disputes are to be resolved by the rule of law.  The evidence in this case shows that the pain in Messier's right shoulder was severe, persistent, and surely diminished the quality of her life; but that pain was not agonizing, paralyzing, and totally disruptive of functioning.  Counsel for Plaintiff argued in summation:

> It seems to me that for the four and a half years that Renee has been

> going through this that over and above her medical bills, if the Court
> would award her $25,000 a year for those four and a half years for
> what she's gone through.  And then, your Honor, to consider and I
> think it's perfectly appropriate for another $10,000 per year for each
> year, that the Court feels that Renee is going to be affected by what
> happened on July 2, 2008.

Tr. Vol. 3 53.  In aid of that claim for future pain and suffering, counsel submitted proof of Messier's

life expectancy.

Given the Findings of Fact I have made, the period of time for which Defendants are liable

for non-economic compensatory damages is three years, not four and a half; and I make no award

for future damages.  Damages for past pain and suffering are usually expressed as a single sum,

rather than on an annual basis, as suggested by counsel.  Counsel's suggestion of $25,000 a year

results in the amount of $75,000 for the three years I will allow as chargeable to Defendants.  Is that

amount excessive?  "The Second Circuit has indicated that, in determining whether an award is

excessive, the court should undertake a comparative evaluation of jury awards," *Koerner v. Club*

*Mediterranee, S.A.*, 833 F.Supp. 327, 334 (S.D.N.Y. 1993) (citing *Martell v. Boardwalk Enterprises,*

*Inc.*, 748 F.2d 740, 752 (2d Cir. 1984)).  It is appropriate to consider Connecticut cases, even though

the case is governed for substantive purposes by the maritime law.  Where neck or shoulder injuries

result in permanent symptoms, Connecticut courts approve six-figure awards of  non-economic

damages: *see, e.g.,  Bruneau v. Seabrook*, 84 Conn.App. 667 (2004) ($200,000); *Betkoski v. Albini*,

No. CV09-50120558S, 2010 WL 4352722 (Conn.Super. Ct. Oct. 8. 2010) ($180,000).  Awards are

in lesser amount where a shoulder injury is painful in the short term but with minimal permanent

effect: *see, e.g., Johnson v. Pike*, 136 Conn.App. 224 (2012) ($50,000).  In the case at bar, $75,000

falls within a reasonable range of non-economic damage, given the severity of the pain  Messier

endured before Dr. Anbari's successful surgery and the attendant frustration Messier felt as the result of the setback to her hard-won improved physical condition.

10.  This $75,000 award for past pain and suffering must be discounted because of Messier's pre-existing conditions and their continuing effect. *Steinhauser* and the cases it cites require that those pre-existing conditions require that Messier's damages for collision-caused pain and suffering during the three years in question be discounted to account for the pain and suffering caused by pre-existing conditions that had to be present during that period.  It is against logic to think that pre-existing conditions (the left leg compromise and limp, arthritis, spinal abnormalities, incipient skeletal degeneration) contributed nothing to the discomfort Messier felt during those years, and no evidence to support a finding that they did not.

On the contrary: ¶ 51 of the Findings of Fact quoted Dr. Sullivan's appraisal of Messier's condition *after the surgery*: "She continued to have this vague pain going down her arm, which, again, she's had a very long history of cervical and thoracic spine.  Cervical meaning the neck and thoracic spine meaning the back of the thorax.  And I think that's probably *just residual from previous to the injury*.  But the shoulder pain ended up doing really well." (emphasis added).  The present point is that just as pain "residual from previous to the injury" contributed to pain after the surgery, so it had to contribute to pain before the surgery.  For example: Plaintiff testified, and her husband and the Carpenters corroborated that testimony, that shortly after the collision, Plaintiff's left leg began to swell.  However, Plaintiff had been dealing with swollen legs, particularly during the summer, for a number of previous years.  The reality of Plaintiff's several pre-existing conditions, and their attendant pain and discomfort, require a discount in an award of damages caused by Defendants' negligence in bringing about the injury.

11.  However, that discount need not be great.  The evidence shows that immediately before the collision, Messier had attained her most favorable physical condition in years.  The collision-caused right shoulder pain dominated the next three years, until the surgery and post-operative therapy largely resolved the problem.  In these circumstances, a 10 percent discount is appropriate.  The result is that non-economic damages of $67,500 will be awarded.

12.  Plaintiff is also entitled to recover her out-of-pocket medical expenses incurred as a result of the injury caused by the collision.  There will be no discount with respect to those expenses.  The trial record contains a great deal of documentary evidence with respect to those expenses.  While Plaintiff's counsel has argued for their award as damages in principle, the record and submissions of counsel do not sufficiently assist the Court in making precise designations of medical expenses for which Defendants are responsible.  Recoverable medical expenses will include all expenses attendant upon Dr. Anbari's surgery (pre-operative, operative and post-operative, paid to physicians, therapists, and hospitals), as well as the expenses Messier incurred post-collision in seeking medical and therapeutic advice and relief for the collision injury prior to consulting Dr. Anbari.  This list is not intended to be exhaustive.  Counsel know the record on this aspect of the case better than the Court.

In these circumstances, counsel are directed to confer in a good-faith effort to agree upon the amount of medical expenses the Court should include in the final judgment.  Counsel are directed to inform the Court of the agreed amount not later than **July 31,  2013**, unless the Court extends the time for good cause shown.  If agreement cannot be reached, counsel are directed to submit simultaneously by that date letter briefs which describe the specific items and areas of disagreement, and the Court will resolve them.  Any agreement resolving this aspect of the case will be without

53

prejudice to the right of any party to appeal from any part of the Final Judgment in the case when

Judgment comes to be filed.

      All of the foregoing is SO ORDERED.

Dated: New Haven, Connecticut
      July 12, 2013


                        */s/Charles S. Haight, Jr.*
                        CHARLES S. HAIGHT, JR.
                        Senior United States District Judge